IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.                         CASE NO. 1:12-cv-102-RS-GRJ

SAMIM ANGHAIE and
SOUSAN ANGHAIE,
individually and
d/b/a NEW ERA TECHNOLOGY, INC.,
and NEW ERA TECHNOLOGY,

     Defendants.

_____/

## REPORT AND RECOMMENDATION

     The United States initiated this civil action by filing a Complaint pursuant to the

False Claims Act, 31 U.S.C. § 3729, *et seq.* (FCA).  Doc. 1.  Plaintiff alleges that

Defendants violated the FCA in connection with Small Business Administration (SBA)

program contracts administered by the Department of the Air Force (AF) and the

National Aeronautical and Space Administration, (NASA), both federal agencies.[1]

The contracts underlying the Complaint were also the basis for the individual

Defendants' convictions of criminal conspiracy and wire fraud charges following a jury

trial.  *See United States v. Anghaie*, Case No. 1:09-cr-37-MP-GRJ.   The individual

Defendants are now proceeding *pro se* in this case, and the Clerk entered a default as

---

[1]As it pertains to this case, the False Claims Act imposes civil liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or who "knowingly makes, uses, or causes to be used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B).

to the corporate Defendant, New Era Technology, Inc. (NETECH), due to that Defendant's failure to obtain Counsel. Docs. 55, 56.

The Government has moved for summary judgment on all claims. Doc. 20. Defendants have responded in opposition to the Plaintiff's motion. Doc. 33.[2] The Court previously denied Defendants' motion for summary judgment on Counts 2 and 3 on statute of limitations grounds, and partial summary judgment as to damages on the remaining 20 counts of the Complaint. Docs. 66, 70. Consideration of the remaining motion for summary judgment was deferred pending settlement negotiations, but such negotiations have concluded in an impasse. This case is now set for trial on March 9, 2015. Doc. 70.

For the following reasons, the undersigned concludes that the Government's summary judgment motion is due to be granted.

## I. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." *Samples on Behalf of Samples v. Atlanta,* 846 F. 2d 1328, 1330 (11th Cir. 1988). As the Supreme Court held

---

[2] Defendants' summary judgment motion and response in opposition to Plaintiff's motion were filed through counsel. The motions were referred to the undersigned for recommended disposition after Defendants' counsel withdrew from the case.

in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact.  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."  *Rollins v. Techsouth*, 833 F.2d 1525, 1528 (11th Cir. 1987).  The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.   *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 785-86 (11th Cir. 2005).  At the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Liberty Lobby, Inc.,* 477 U.S. at 249.  Some degree of factual dispute is expected, but to successfully counter a motion for summary judgment the factual dispute must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

## II.  Background

The Government's summary judgment evidence consists of the trial record and exhibits entered in the underlying criminal case.  *See* Docs. 20, 21 (Government's Statement of Undisputed Material Facts).  In their opposition to summary judgment, the Defendants similarly rely on excerpts from the trial testimony.  *See* Docs. 40; 41 (Defendants' Amended Statement of Undisputed Material Facts).  The Court also takes judicial notice of the record on appeal in the criminal case in *United States v. Anghaie*,

ECCA Nos. 12-10086 & 12-10087 (11th Cir. 2013).  Based upon this evidence, the following facts are undisputed.

NETECH was a Florida for profit corporation formed in 1989 by Sousan Anghaie and Samim Anghaie.   Between 1999 and 2009, Samim Anghaie was employed full time as a professor at the University of Florida and served as the Director of the Innovation Nuclear Space Power and Propulsion Institute (INSPI) at UF, a UF-sponsored research center.   The Complaint in this case concerns four funded contracts within the SBA's Small Business Innovation Research Program (SBIR) and Small Business Technology Transfer Program (STTR), as administered by NASA and the Air Force, that were awarded to NETECH for the development of an innovative nuclear fuel for aerospace applications:  NNC07CA14C ("N14C"), NNM04AB19C ("N19C"), NNC06CA72C ("N72C"), and FA9550- 06-C-0099 ("AF99").

Relative to these four and other contracts, the individual Defendants were charged in a superseding indictment on December 20, 2010, with sixty-two counts of violations of federal law including conspiracy, wire fraud, false statements to a federal agency, and money laundering.   *See* Superceding Indictment, Case No. 1:09-cr-37-SPM-GRJ, Doc. 69.  Defendants were granted a judgment of acquittal on ten substantive counts of wire fraud and five substantive counts of money laundering (Counts 23-31, 42, 52-56) on the grounds that such counts were barred by the general federal five-year statute of limitations for criminal offenses. *See* Case No. 1:09-cr-37-SPM-GRJ, Doc. 114.  The jury acquitted Defendant Samim Anghaie of eight substantive counts of wire fraud (Counts 10, 11, 32, 33, 34, 36, 38, 45).  *Id*.  Doc. 123.  The jury

acquitted Defendant Sousan Anghaie of nine substantive counts of wire fraud and one count of knowingly and willfully making and using false documents (Counts 10, 11, 32, 33, 34, 36, 38, 44, 45, and 61).   *Id*.  The jury was unable to reach a verdict on any of the counts involving allegations of money laundering or, as to Sousan Anghaie, on the count of making false statements (Counts 48-51, 57-60, 62).   *Id.*

The offense conduct is summarized in the presentence report, as to which all parties had the opportunity to object.  *See* Case. No. 1:09-cr-37-MP-GRJ Doc. 192. Although Defendants objected to the summary of the offense conduct because it had been supplied by the Government, the district court overruled the objections at sentencing, finding that the PSR was accurate and incorporating the findings of the PSR into the sentence.  *Id*. Doc. 178.  According to the offense conduct summary, the evidence adduced at trial reflected that Defendants submitted contract proposals to SBIR and STTR on behalf of  NETECH that incorporated specific budget items.  Both SBIR and STTR contracts required designation of a Principal Investigator (PI), whose specific activities and duties were described in the proposals.  Under SBIR program requirements, the primary employment of the PI was required to be with the contracting small business.  Under the STTR program the PI could be employed by either the small business or an affiliated research institute.  Following the award of a contract, the contractor submitted technical and final reports in order to request payment. Defendants submitted contract proposals containing fraudulent information regarding identities of  NETECH personnel and work performed by such personnel, including the identities of the PI's, research scientists, staff scientists, engineers, and laboratory

assistants.  The proposals falsely described the number of employees at  NETECH, the

relationship between  NETECH and UF, the origin of some of the research produced

(which was produced by persons other than identified in the proposals), and the use of

subcontractors.  Defendants submitted invoices claiming labor hours for alleged

employees that  NETECH claimed to have paid, but who had not been paid and had not

performed work under the contract.  Defendants submitted "stolen" research information

that had been produced by UF graduate students and other professors, and work at a

Russian laboratory.  UF was unaware that Defendants were using UF facilities and

personnel for NeTech.  *Id*., Doc. 192 at 5-8.

> In accepting these findings at sentencing, the Court noted:

> The gist of the offense lies in the fact that the contracts at issue were
> reserved for legitimate small businesses and the defendants knowingly
> made misrepresentations to qualify for those contracts.  There is a real and
> substantial harm to the government when funds set aside for small
> businesses are diverted to other uses. The misrepresentations the
> defendants made were material to the agencies' decision to award the
> contracts to  NETECH under the SBIR and STTR programs.  By making
> those misrepresentations the defendants caused harm to the government
> and legitimate small businesses who otherwise would have received those
> funds.

*Id.* Doc. 178 at 3-4.

Defendant Samim Anghaie was sentenced to six months' imprisonment and three

years' supervised release.  Doc. 188.  Defendant Sousan Anghaie was sentenced to five

years' probation, including 6 months' home confinement.  Doc. 190.  The Court entered

a civil forfeiture judgment against Defendants in the amount of $390,252.91,

representing the aggregate dollar amount of deposits linked to the substantive counts of

wire fraud of which the Defendants were convicted.  *Id*.  Doc. 151.  The Court declined,

however, to award restitution to the United States, finding that no actual loss to the United States, as the victim, had been established for purposes of restitution. *Id*. Doc. 238.

On appeal, the Eleventh Circuit concluded that the evidence at trial was sufficient to convict Defendants on the counts for which they were convicted.  On the Government's cross-appeal, the Court concluded that the district court did not err in the amount of forfeiture or in failing to order Defendants to pay restitution. *Id*. Doc. 272.

The instant Complaint alleges 22 counts of FCA violations.  Count 1 of the Complaint alleges that Defendants engaged in a conspiracy to submit false claims in connection with the contracts, in violation of 31 U.S.C § 3729(a)(3).  Counts 2-22 collectively allege that Defendants made false certifications and representations when initially submitting the contract proposals, when filing technical reports, and when submitting invoices for payment, on 22 separate dates under four contracts.  Doc. 1. The Government contends that its payments under such invoices totaled $915,543.79, and that it is further entitled to treble damages under the FCA and statutory penalties. *See* Doc. 20.

### III.  Discussion

### *A. The Civil False Claims Act*

A successful FCA claim requires proof of the following:  (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false. *United States v. R & F Properties of Lake County, Inc.,* 433 F.3d 1349, 1355 (11th Cir.

2005).   Further, 31 U.S.C § 3731(e) provides that:

> Notwithstanding any other provision of law, the Federal Rules of Criminal Procedure, or the Federal Rules of Evidence, a final judgment rendered in favor of the United States in any criminal proceeding charging fraud or false statements, whether upon a verdict after trial or upon a plea of guilty or nolo contendere, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subsection (a) or (b) of section 3730.

As the Eleventh Circuit has explained:

> When an issue is resolved in favor of the United States in a criminal prosecution, that issue may not be contested by the same defendant in a subsequent civil suit brought by the government. *Tomlinson v. Lefkowitz,* 334 F.2d 262, 264 (5th Cir.1964), *cert. denied,* 379 U.S. 962, 85 S.Ct. 650, 13 L.Ed.2d 556 (1965). This rule applies in all civil cases brought by the United States where a defendant previously has been found guilty, either by a jury verdict or by a guilty plea. *See Emich Motors Corp. v. General Motors Corp.,* 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951); *In re Raiford,* 695 F.2d 521 (11th Cir.1983). *See also Sell v. United States,* 336 F.2d 467 (10th Cir.1964) (in False Claims Act case, prior criminal conviction estops defendant contesting same issue in subsequent civil proceeding).

*U.S. v. Killough,* 848 F.2d 1523, 1528 (11th Cir. 1988).

### 1.  Counts of the Complaint subject to estoppel

The Government contends in its summary judgment motion, *inter alia*, that

Defendants are estopped from defending the claims in the Complaint due to the criminal

convictions.  Doc. 20.  In their opposition to summary judgment, Defendants assert –

and the Government does not dispute – that some counts in the civil Complaint do not

precisely correspond to the counts of conviction in the underlying criminal case, or

correspond to counts for which Defendants were acquitted.[3]   Counts 7, 8, 9, and 10 of

---

[3] On August 4, 2014, the undersigned conducted a telephonic case status conference with the parties to discuss, *inter alia*, the status of pending settlement negotiations and the effect on

the civil Complaint concern AF99; Defendants were acquitted of fraud in the submission of the proposal for AF99 (Superceding Indictment Count 38).  Counts 14 and 15 of the civil Complaint allege false claims regarding March 14 and 18, 2008, invoices with respect to N14C; Defendants were acquitted of wire fraud in connection with those transactions in the criminal case (Superceding Indictment Counts 10 and 11).  Counts 18, 19, 21 and 22 in the civil Complaint allege transactions on July 24, 2008, August 19, 2008, November 18, 2008, and December 4, 2008 with respect to N14C; such transactions do not correspond with counts of conviction in the criminal case.

In sum, Defendants assert that the following nine counts of the civil Complaint either do not correspond to charges in the Superceding Indictment or pertain to offenses of which Defendants were acquitted: Complaint Counts 7, 8, 9, 10, 15, 18, 19, 21, 22. *See* Doc. 33 at 10-11.  Defendants contend that estoppel is therefore inapplicable to those counts.

In opposition to summary judgment as to the remaining counts, Defendants generally contend that the trial evidence does not establish "causation, that the fraud actually succeeded to cause a loss," and Defendants also dispute the amount of damages claimed by the Government.  Doc. 33.  Defendants' opposition to the summary judgment motion was filed while the underlying convictions were still pending on appeal. Defendants state that assuming the convictions were affirmed and estoppel is applicable to the remaining 13 counts of the civil complaint (Complaint Counts 1, 2, 3, 4, 5, 6, 11,

---

the pending summary judgment motions.  The parties conceded that certain counts of the Complaint were subject to estoppel because they represented counts of conviction in the criminal case, but that other counts were not subject to estoppel because they either were not part of the criminal case or Defendants had been acquitted of the related criminal counts.

12, 13, 14, 16, 17, and 20), then the damages award would be only the payments made regarding such counts, "multiplied by three, then *less* the $390.252.92 already awarded and *less* the value of the goods and services conferred on the government."   Doc. 33 at 13.

Count 1 of the civil Complaint corresponds to Count 1 of the Superceding Indictment (conspiracy), of which Defendants were convicted.  Counts 2, 3, and 4 pertain to payments made under N19C on January 19, 2006, April 7, 2006, and April 6, 2007; Defendants were convicted of Count 35 of the Superceding Indictment charging them with wire fraud in connection with the proposal for N19C.  Counts 5 and 6 of the civil Complaint pertain to payments made under N72C on June 5, 2006 and September 28, 2006; Defendants were convicted of Count 37 of the Superceding Indictment charging them with wire fraud in connection with the submission of the proposal for N72C.  Counts 11, 12, 13, 16, and 17 of the civil Complaint pertain to payments under N14C on July 12, 2007, November 21, 2007, January 11, 2008, June 3, 2008, and July 2, 2008; Defendants were convicted of Counts 4, 7, 8, 12, and 14-15 of the Superceding Indictment charging them with wire fraud for those same payments.  Count 20 of the civil Complaint pertains to a payment under N14C on September 18, 2008; Defendants were convicted of Count 17 of the Superceding Indictment charging them with wire fraud for that same payment.

Defendants argue that triable issues exist regarding whether Defendants knowingly submitted contract proposals that contained false information regarding the identity of "key personnel" under the contracts, the eligibility of the identified PI, the

number of  NETECH employees, the nature of the relationship between  NETECH and

INSPI and MAIC, whether activities would be conducted at  NETECH facilities, whether

NETECH would subcontract any work, and whether information was included that had

been obtained from other researchers without their knowledge or consent.  Doc. 41.  As

support for these arguments, Defendants point to excerpts from the criminal trial

testimony.  *Id*.  However, as explained above, the sentencing court in concluding that the

findings of the PSR were accurate and in adopting the offense conduct summary of the

PSR rejected each of these assertions.  *See* Case. No. 1:09-cr-37-MP-GRJ Doc. 192.

These arguments are foreclosed by Defendants' underlying conspiracy and fraud

convictions.

In sum, there is no genuine issue of material fact regarding whether the

Government is entitled to summary judgment on the basis of  31 U.S.C § 3731(e) for the

following payments to Defendants:

| Civil Comp.<br>Count No. | Date | Contract | Amount |
|---|---|---|---|
| 2 | 1/19/06 | NNM04AB19C | 57,300.58 |
| 3 | 4/7/06 | NNM04AB19C | 75,029.55 |
| 4 | 4/6/07 | NNM04AB19C | 85,237.31 |
| 5 | 6/5/06 | NNC06CA72C | 46,656.96 |
| 6 | 9/28/06 | NNC06CA72C | 23,328.48 |
| 11 | 7/12/07 | NNC07CA14C | 74,998.71 |
| 12 | 11/21/07 | NNC07CA14C | 150,700.36 |
| 13 | 1/11/08 | NNC07CA14C | 44,555.90 |
| 14 | 3/14/08 | NNC07CA14C | 17,740.08 |
| 16 | 6/3/08 | NNC07CA14C | 47,999.17 |
| 17 | 7/2/08 | NNC07CA14C | 23,999.58 |
| 20 | 9/18/08 | NNC07CA14C | 23,999.59 |

*See* Government's Summary Judgment Exhibits Docs. 20-39; 20-46.

### 2. Counts of the Complaint not subject to estoppel

The following chart reflects the remaining counts of the Complaint which

Defendants contend are not subject to estoppel:

| Civil Count No. | Date | Contract | Amount |
|---|---|---|---|
| 7 | 1/5/07 | FA9550-06-C-0099 (AF99) | 30,000 |
| 8 | 3/22/07 | FA9550-06-C-0099 (AF99) | 30,000 |
| 9 | 7/25/07 | FA9550-06-C-0099 (AF99) | 30,000 |
| 10 | 2/8/08 | FA9550-06-C-0099 (AF99) | 10,000 |
| 15 | 3/18/08 | NNC07CA14C | 47,999.17 |
| 18 | 7/24/08 | NNC07CA14C | 23,999.58 |
| 19 | 8/19/08 | NNC07CA14C | 23,999.59 |
| 21 | 11/18/08 | NNC07CA14C | 23,999.59 |
| 22 | 12/4/08 | NNC07CA14C | 23,999.58 |

Specifically, Defendants contend that there is a genuine issue whether any

statements attributed to Defendants in connection with these contracts caused the

Government to make the payments, or whether the payments were made based upon

work product produced by Defendants.  Doc. 41 at 32.

As discussed above, Counts 7, 8, 9, and 10 of the Complaint concern AF99;

Defendants were acquitted of fraud in the submission of the proposal for AF99

(Superceding Indictment Count 38).   However, Defendants were convicted of three

counts of wire fraud in connection with the submission of technical reports under this

contract (Superceding Indictment Counts 39, 40, 41).   Specifically, Defendants

represented that the PI for the contract was Angelo Ferrari and that the University of

South Carolina was the involved institution.  *See* Doc. 20-44.  A representative of the AF

Office of Scientific Research, Mitat Birkin, testified that the identity of the PI was

particularly important to his review of the contract and that he would not have recommended the contract, accepted the reports, or recommended payment if the named PI was not actually involved in the contract.   Doc. 20-59 at 53-65.   The final report for the contract in fact contained data from the doctoral dissertation of Leo Bitteker, who had not been identified as a PI on the contract and was unaware that his dissertation was being so used.   *Id*. at 36-50.   Based on this testimony, the Government contends that the invoice payments reflected in Counts 7, 8, 9, and 10 of the Complaint would not have been made had the true facts been known.   Doc. 21 at 20.

Defendants contend that there is a genuine issue of material fact as to whether statements made in the forms (known as form 1443s) submitted for payment relative to employees and hours of work were material to the payment of a firm-fixed-price contract "so long as the government receives and accepts the scientific work product for which it bargained."   Doc. 41.   Defendants contend that such scheduled progress payments are considered a form of government financing for SBIR and STTR contracts to enable small business concerns to undertake fixed-price contracts.   *Id.*   Notably, however, Defendants do not dispute that they misrepresented the identity of the PI on the contract or the true source of the scientific data that was submitted.   The gravamen of a FCA claim is the submission of a false or fraudulent claim for payment by the Government, with the knowledge that it is false.   Defendants point to no authority suggesting that the acceptance of the scientific work product prior to learning of the falsity of the claim for payment negates an element of the FCA claim.   Rather, Defendants' argument appears to be directed more to the issue of damages.   Further, the Government has pointed to

competent summary-judgment evidence, in the form of Birkin's testimony, that the

identity of the personnel for whom payment was being claimed under the contract was

material to the decision to pay the claims for progress payments.  Doc. 20-59 at 53-65.

The Court concludes that Defendants have failed to establish the existence of a genuine

issue of material fact regarding whether the payments reflected in counts 7, 8, 9, and 10,

which were based on false representations of a material aspect of the contract, amount

to a FCA violation.

In a similar vein, Defendants contend that the Government is not entitled to

summary judgment with respect to the payments under contract NNC07CA14C that are

the basis for Counts 15, 18, 19, 21, and 22 because such payments were scheduled

progress payments based upon work product produced and not upon any statements

made by Defendants.  As the Government points out, and as explained above, the

testimony at Defendants' criminal trial reflects that the contract proposal misrepresented

the number of  NETECH employees, the facilities to be used for the contract, the identity

of the PI and other key personnel, the existence of subcontractors, and other matters.

NASA's contractor representative for this contract, Bryan Palaszewski, testified that the

certifications made by Defendants in the contract proposal were material in his

determination of whether to recommend the contract, and had he been aware of the

truth he would not have recommended the contract.   Doc. 20-55.  Again, the gravamen

of a FCA claim is the submission of a false or fraudulent claim for payment by the

Government, with the knowledge that it is false.   Although the Government may have

received some work product under the contract, the claims for payment were based

upon the false and fraudulent proposals and technical reports.   The Court, therefore,

concludes that Defendants have failed to establish the existence of a genuine issue of material fact regarding whether the payments reflected in counts 15, 18, 19, 21, and 22 of the Complaint amount to a FCA violation.

### B. Civil Penalties and Damages

"The FCA imposes two types of liability." *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1277 (D.C.Cir. 2010) (hereafter *"SAIC"*). "First, a defendant who submits a false claim or makes a false statement to get a false claim paid is liable for civil penalties regardless of whether the government shows that the submission of that claim caused the government damages.  Second, the defendant is liable for 3 times the amount of damages which the [g]overnment sustains because of the act of [the defendant]." *Id*. at 1277–78; 31 U.S.C. § 3729(a).   The penalty amount is "not less than $5,000 and not more than $10,000." *Id*.  Before the government may recover treble damages, it must "demonstrate the element of causation between the false statements and the loss."  *See United States v. Miller*, 645 F.2d 473, 475–76 (5th Cir.1981).

Turning first to the issue of damages, Defendants do not dispute the accuracy of the amount of each of the payments identified in the Complaint.  Rather, Defendants contend that if liability is found then the amount of damages in this case should be offset by the $390,252.92 forfeiture award and by the value of the goods and services conferred upon the Government.  Doc. 33 at 13.  This latter argument is based on the Court's statements at sentencing that Defendant  NETECH provided "valuable innovative research" to the Government under the contracts and that "no actual loss to the victims has been established in this case."  1:09-cr-37-SPM-GRJ, Doc. 238.  The

Court made these statements in connection with its conclusion that restitution should not be awarded to the United States. *Id.*

The sentencing court's pronouncements regarding restitution are not determinative of the damages award in this case.  The Eleventh Circuit has recognized that "[a]n order of restitution is not a judicial determination of damages.   Damages measure the amount of compensable loss a victim has suffered.   Restitution, by contrast, is an equitable remedy, 'subject to the general equitable principle that [it] is granted to the extent and only to the extent that justice between the parties requires.'" *United States v. Barnette,* 10 F.3d 1553, 1556-57 (11th Cir. 1994).  In *Barnette*, the Eleventh Circuit declined to limit a damages award in a civil FCA case to the amount of restitution awarded by the district court, noting that the defendant's attempt to equate the sentencing judge's restitution order with a determination of damages was "unpersuasive".  *Barnette*, 10 F.3d at 1556-57.  The Court held that "[m]ore likely, the sentencing judge decided that the Government had lost at least $7 million and that Barnette could pay that amount, but left final resolution of the Government's damages claim to the ensuing civil case." *Id*.  Although the sentencing court in this case determined that no restitution should be awarded, the reasoning of *Barnette* nevertheless directs that a restitution finding in a criminal case does not foreclose the United States from seeking a different damages award in a subsequent civil case.  *See id*.

The Eleventh Circuit has also held that "[u]nder the [FCA], there is no set formula for determining the government's actual damages . . . .  Case law indicates the measure

of damages is generally determined to be the difference between what the government actually paid on the fraudulent claim and what it would have paid had there been fair, open and competitive bidding."   *United States v. Killough,*  848 F.2d 1523, 1532 (11th Cir. 1988) (citing *Brown v. United States*, 524 F.2d 693, 706 (Ct. Cl. 1975); *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir.1966); *United States v. Am. Precision Prods. Corp.*, 115 F.Supp. 823, 828 (D.N.J.1953)).  "The trier of fact must deduce from all the evidence presented what the fair market value was of the goods or services provided in order to calculate the actual damage the government suffered."  *Id*.  The Government bears the burden of proving its damages in a FCA case.  *See* 31 U.S.C § 3731(d); *United States v. Applications Intern. Corp.*, 626 F.3rd 1257, 1280 (D.C. Cir. 2010) (hereafter *"SAIC"*).

The Government contends that in this case any alleged end-product of the contracts obtained by fraud is valueless because the contracts were awarded under SBIR and STTR programs designed to foster innovation by eligible small businesses. Doc. 20.  The Government argues that it:

> [W]as not seeking nor did it receive any economic benefit. Rather, it was seeking an intangible benefit - the ability to encourage small business scientific development. This being true, there was and can be no economic, tangible, benefit to the agencies. Indeed, the defendants' fraudulent misconduct only resulted in multiple harms. Because of their frauds, they received contracts to which they were not entitled and other, honest and more deserving companies were denied funding. The fraud also hurt the integrity of the program, resulting in further harm when Congress evaluates the propriety of continuing funding. The funds for each program are finite. Finally, there is simply no way to measure the innovations lost by not funding these other, deserving, small businesses. The defendants' misrepresentations went directly to the heart of the SBIR and STTR programs-their ability to perform research on technology that was novel and innovative.

*Id*. The Government asserts that the benefit of the bargain analysis does not apply in cases where there was no tangible benefit due to fraud in the contracting process. *See, e.g., United States ex rel. Longhi v. Lithium Power Techs., Inc.,* 575 F.3d 458, 472–73 (5th Cir. 2009) (affirming award of damages based on full amount of Government grant without offset); *United States v. TDC Management Corporation, Inc.*, 288 F.3d 421, 422-23 (D.C. Cir. 2002) (fraud in contract to find private investors and sureties for minority enterprises completely destroyed the value of the program).

The issue of how FCA damages should be calculated when government funds have been used in violation of program requirements that are designed to further intangible goals was addressed in *SAIC*. *SAIC* involved a contract with the Nuclear Regulatory Commission to help develop regulations governing the release of contaminated materials. The contract required SAIC to certify that it had no organizational conflicts of interest. The Government successfully sued SAIC under the FCA, alleging that SAIC had falsely certified its compliance with the conflict of interest provisions. However, the D.C. Circuit reversed the jury's damages award because the district court had instructed the jury that its calculation of damages should not account for the value of services, if any, that SAIC conferred upon the NRC. *SAIC*, 626 F.3rd at 1278. The D.C. Circuit concluded that the trial court should have instructed the jury "to calculate the government's damages by determining the amount of money the government paid due to SAIC's false claims over and above what the services the company actually delivered were worth to the government." *Id.* at 1279-80. The Court specifically noted, however, that "[i]n some cases, such as where the defendant

fraudulently sought payments for participating in programs designed to benefit third-parties rather than the government itself, the government can easily establish that it received nothing of value from the defendant and that all payments made are therefore recoverable as damages." *Id*. at 1279 (citing *TDC*, 288 F.3d at 428; *Longhi* , 575 F.3d 458, 473 (5th Cir. 2009) (calculating damages as the amount the government paid to the defendants where "[t]he contracts entered ... did not produce a tangible benefit" to the government and were instead part of a grant program designed to award money to deserving small businesses); *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (concluding that the defendant, who submitted false claims for Medicare and Medicaid payments, was required to repay the full amount of the claims as damages because the defendant "did not furnish any medical service to the United States," and instead effectively sought a government subsidy to which it was not entitled)).

The D.C. Circuit made clear that it is the Government's burden to prove, as a matter of law, that it received nothing of value from the compromised contracts. The Court observed that in meeting this burden "the government remains free to argue that the value of SAIC's advice and assistance was completely compromised by the existence of undisclosed conflicts, making the full amount paid to SAIC the proper measure of damages. SAIC, however, must also be allowed to offer evidence to the contrary, such as evidence about the technical quality of its work, the fact that the NRC continued to use SAIC's work product after the potential conflicts were identified and the 1999 contract was terminated, and testimony by NRC's project manager that SAIC's actual work product 'constituted the opposite of a conflict.'" *SAIC*, 626 F.3d at

1279-1280.

Of particular relevance to the instant case is *Longhi*, 575 F.3rd 458 (5th Cir. 2009), relied upon by the Government in this case and cited by the *SAIC* court for the proposition that where the defendant fraudulently sought payments for participating in programs designed to benefit third-parties, the government can easily establish that it received nothing of value and that all payments made are therefore recoverable as damages.  In *Longhi*, the relator alleged that the defendant had defrauded the government by misrepresenting its capabilities to perform under a SBIR program grant. The Government obtained summary judgment on the issue of liability and then moved for summary judgment on damages.  *Id*. at 462.  The district court awarded the government damages in the full amount of the invoices the defendant had submitted under the contract.  *Id*. at 464.  The Fifth Circuit affirmed, analyzing the damages award under the "benefit of the bargain" paradigm noted above.  The court determined, however, that the Defendant had not produced a tangible benefit to the contracting agency because "the purpose of the SBIR grant program was to enable small businesses to reach Phase III where they could commercially market their products."  *Id*. The Fifth Circuit concluded that "[t]he Government's benefit of the bargain was to award money to eligible deserving small businesses. The BMDO and the Air Force's intangible benefit of providing an 'eligible deserving' business with the grants was lost as a result of the Defendants' fraud."  *Longhi*, 575 F.3rd at 473.  Accordingly, the Fifth Circuit determined that "where there is no tangible benefit to the government and the intangible benefit is impossible to calculate, it is appropriate to value damages in the amount the

government actually paid to the Defendants." *Id*.

The Fifth Circuit's assessment in *Longhi* mirrors the sentencing court's conclusion in this case that "[t]here is a real and substantial harm to the government when funds set aside for small  businesses are diverted to other uses. The misrepresentations the defendants made were material to the agencies' decision to award the  contracts to NETECH under the SBIR and STTR programs.  By making those misrepresentations the defendants caused harm to the government and legitimate small businesses who otherwise would have received those funds." *Anghaie*, Case. No. 1:09-cr-37-MP-GRJ Doc. 178 at 3-4.

As in *Longhi*, the contracts at issue in this case were not standard procurement contracts where the Government ordered a specific product or good.  *See Longhi*, 575 F.3rd at 473.  Rather, the SBIR and STTR programs were intended to foster innovation by eligible small businesses.  In view of this authority and based upon the purpose of the contract programs at issue in this case, the Court is persuaded that the Government has met its burden of establishing, for purposes of FCA damages, that there was no tangible benefit to the Government under the contracts and any intangible benefit is impossible to calculate.  Therefore, the measure of damages is the amount the Government actually paid under the contracts.  *Longhi*, 575 F.3rd at 473.

The Court is further persuaded that, as the sentencing court determined, Defendants' misrepresentations caused harm to the Government by diverting funds that otherwise would have gone to legitimate small businesses, and therefore the causation element necessary for the recovery of treble damages is satisfied.  *See Longhi*, 575

F.3d at 473.  The amounts paid by the Government on the contract invoices at issue in this case total $915,543.79.  Under the FCA, that amount is tripled to $2,746,631.37.

With respect to the statutory penalties, the Government seeks a maximum penalty of $11,000 for each of the claims paid as identified in the Complaint, for a total of $231,000.  The Government contends that the maximum penalty is appropriate because the instant suit under-represents both the impact of the fraud and the money lost by the United States.  Doc. 20.  Defendants do not address the propriety of any penalty amount.

"The False Claims Act . . . does not set any specific formula for imposing civil penalties, but authorizes federal trial courts to award monetary relief that will afford the Government a base civil penalty amount that can be adjusted, in the court's discretion, up to the statutory ceiling."  *Morse Diesel Intern., Inc. v. U.S.*  79 Fed. Cl. 116, 124 (Fed. Cl. 2007) (citing 31 U.S.C. § 3729(a)(1), (b)(1) (setting civil penalties prior to September 29, 1999 at a range from $5,000–$10,000)).  A variety of factors have been utilized by courts in exercising that discretion.  *See Morse Diesel*, 79 Fed. Cl. 116 at 124.  Among such factors are whether the government has been made whole by an award of treble damages such that a statutory penalty is unnecessary, whether the contractor cooperated in the government's investigation, and whether the government has shown that a penalty greater than the statutory minimum is appropriate.  *Id.*  "The United States Supreme Court has recognized that the civil penalty component and separate damage component of the False Claims Act were meant to 'provide for restitution to the government of money taken from it by fraud, and that the device of double damages

[prior to trebling required by the 1946 amendments] plus a specific sum was chosen to make sure that the government would be made completely whole.'" *Id*. (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551 (1943)).

In view of the pervasive nature of the contract fraud in this case, the number of contracts involved, and the extensive resources expended by the Government in investigating and prosecuting the fraud, the Court is persuaded that the maximum civil penalties of $231,000, in addition to treble damages, are both warranted and reasonable.  *See id.*

## IV.  Conclusion

For the foregoing reasons, it is respectfully **RECOMMENDED** that the Government's motion for summary judgment, Doc. 20, should be **GRANTED**.  It is further recommended that the Government should be awarded damages in the amount of $2,746,631.37 and that Defendants should be assessed a penalty of $231,000, pursuant to 31 U.S.C. § 3729(a).

**IN CHAMBERS** at Gainesville, Florida this 10th day of December 2014.


*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

**NOTICE TO THE PARTIES**

Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations